# EXHIBIT A

STATE OF RHODE ISLANDPROVIDENCE, RHODE ISLAND, SC

SUPERIOR COURT

| | |
|---|---|
| HANNAH ULERY, | § |
| | § |
| Plaintiff, | § |
| | § |
| | §   C.A. No: PC-2023-05366 |
| | § |
| vs. | § |
| | § |
| | § |
| | § |
| JASON R. RAFFERTY, MD; | § |
| JULIE LYONS; JESSICA | § |
| FIDALGO TOUCINHO; | § |
| ANDREW SACKETT-TAYLOR; and | § |
| and THUNDERMIST HEALTH CLINIC, | § |
| | § |
| Defendants | § |

## SECOND AMENDED COMPLAINT

Plaintiff Hannah Ulery hereby alleges as follows:

### INTRODUCTION

1. Plaintiff Hannah Ulery (a.k.a. Layton or Leighton Ulery)[1] brings this complaint against

the Defendants for medical malpractice and other related causes of action in connection with

recklessly providing her "transgender-affirming" treatments and therapies.  Layton, as she

---

[1] Plaintiff files this Second Amended Complaint after U.S. District Judge Mary S. McElroy's September 17, 2025, Order dismissing, without prejudice on jurisdictional grounds, defendants Thundermist, Jason R. Rafferty, M.D., Jessica Fidalgo Toucinho, and Andrew Sackett-Taylor, and remanding the state-law claims against defendant Julie Lyons to this Court. As Plaintiff previewed to Judge McElroy in her August 7, 2025, Opposition brief, at page 22 and note 4, this Second Amended Complaint is filed so it can be "re-removed by the United States if necessary, with 'the second removal actually constitut[ing] a new federal case, with a new case number and a new docket in the federal district court.'" Plaintiff's Opp'n, 22 n.4 (quoting *D.L. by & through Junio v. Vassilev*, 858 F.3d 1242, 1246–47 (9th Cir. 2017) (employing such procedure in case with federal and non-federal defendants)). At the time of treatment, and while experiencing episodes of "switching" between dissociated identities, Plaintiff went by the name of "Leighton."  Currently, Plaintiff goes by the name "Layton" recognizing her new unified identity, which integrates her previously dissociated personalities.  As such, she will be hereinafter referred to as "Layton."

1

prefers to be called, was in a fractured and unstable psychiatric condition when she sought treatment from the Defendants for her myriad disorders. Among those disorders was a diagnosis of dissociative identity disorder, whereby Layton's mind and body were inhabited by more than eight autonomous identities with various medical and psychological needs. Instead of providing her with medical therapy and treatment as dictated by her best medical interest in resolving her disorders, Defendants prioritized their own agendas, ideologies, and professional interests and pulled her down a harmful path of transgender-affirming medicalization that was detrimental to her long-term health and well-being.

2. Although Layton was thankfully able to obtain life-saving treatment from other providers that now allows her to live a productive and healthy life, that helpful treatment came too late to avoid the life-long, irreversible injuries caused by Defendants breaches of the standards of care. Layton now seeks redress for those injuries.

## **PARTIES**

3. Plaintiff, Hannah Ulery, is a resident of the City of Asheville, State of North Carolina.

4. Defendant, Jason R. Rafferty, MD, was at all times material herein a medical doctor holding himself out as a specialist in psychiatry licensed and engaged to practice medicine in the State of Rhode Island. The conduct alleged against Dr. Rafferty all took place within the State of Rhode Island.

5. Defendant, Julie Lyons, LICSW, was at all times material herein a licensed independent clinical social worker and therapist licensed and engaged to practice social work and therapy in the State of Rhode Island. The conduct alleged against Ms. Lyons all took place within the State of Rhode Island.

6. Defendant, Jessica Fidalgo Toucinho,[2] LMHC, was at all times material herein a licensed mental health counselor licensed and engaged to practice mental health counseling in the State of Rhode Island. The conduct alleged against Ms. Fidalgo all took place within the State of Rhode Island.

7. Defendant, Andrew Sackett-Taylor,[3] PMHNP, was at all times material herein a psychiatric-mental health nurse practitioner, holding himself out as a specialist in psychiatric medicine, licensed and engaged in the nursing practice in the State of Rhode Island. The conduct alleged against Nurse Taylor all took place within the State of Rhode Island.

8. Defendant, Thundermist Health Clinic, was at all times material herein a Rhode Island Corporation operating as Thundermist of Woonsocket and Thundermist of West Warwick, with its principal place of business located at 171 Service Avenue in the City of Warwick, County of Kent, State of Rhode Island.

**JURISDICTIONAL ALLEGATIONS**

9. This Court has personal jurisdiction over all Defendants because, at all times relevant to the allegations herein, the Defendants committed the alleged torts within the territorial limits of the State of Rhode Island.

10. This Court has subject matter jurisdiction over the allegations raised herein because at all times relevant thereto, the conduct and torts committed by the defendants occurred against a Rhode Island citizen within the territorial limits of the State of Rhode Island.

---

[2] At all times relevant to the allegations, Defendant Jessica Fidalgo Toucinho was named Jessica Fidalgo, and her name appears as such on Layton's medical records. So then, for consistency and clarity, she will be hereinafter referenced as "Ms. Fidalgo" or "Fidalgo" to maintain consistency with the medical records at issue in the dispute.

[3] At all times relevant to the allegations, Defendant Andrew Sackett-Taylor was named Andrew Taylor, and his name appears as such on Layton's medical records. So then, for consistency and clarity, he will be hereinafter referenced as "Mr. Taylor," "Nurse Taylor," or "Taylor" to maintain consistency with the medical records at issue in the dispute.

## ALLEGATIONS RELEVANT TO ALL CLAIMS

### A. Layton's background and mental condition upon meeting the Defendants

11. When Layton met the Defendants, she was a traumatized lesbian woman who had only just recently escaped from over 18 years of physical, sexual, and psychological torment at the hands of a cult and its leadership, which began for her around age 6. In addition to the torment and abuse she suffered, the cult leaders also subjected Layton to multiple rounds of conversion therapy attempting to "cure" her of her homosexuality. Fortunately, Layton escaped the cult in early 2015, yet in doing so, she was forced to leave her parents and younger brother behind, meaning she lost all contact with them not knowing if she would ever be allowed to speak to them again. Unfortunately for Layton, the sexual and psychological trauma did not stop with her escape, as she was further sexually assaulted multiple while trying to make it in the outside world.[4]

12. Whether caused by her cult imprisonment and torment, the numerous episodes of sexual assault, or other biological/genetic factors, Layton developed a host of psychological disorders at a young age including Dissociative Identity Disorder (DID).

13. Her DID manifested in the formation of up to nine independent identities inhabiting her mind, each with distinct genders, sexual orientations, ages, personalities, levels of maturity, opinions, desires, ideas, and some even having distinct disorder diagnoses. These "alters" are so autonomously distinct that they each formed a separate relationship with Layton's roommate and life partner. During instances when an alter presents (i.e., assumes control of her mind and body), Layton would suffer from gaps in memory of those experiences and actions controlled by

---

[4] Because the details of these assaults greatly impact Layton's state of mind and resulted in various psychological comorbidities that weigh on her ability or capacity to provide informed consent, those details are highly relevant to her claims against the defendants. However, given the public nature of this complaint, and to safeguard Layton's privacy interests and the sensibilities of the viewing public, those details will be reserved for disclosure in a form deemed more appropriate by the Court.

4

the alter. So then, due to the significant degree of autonomy and individuality of the alters,

Defendants were providing medical services to not only the identity called "Leighton," but also

the following individuals inhabiting her mind and body:

a. **Liv** Ulery | **19-year-old cis female lesbian** most similar to Layton who has a relationship with Layton's roommate and partner that was independent from Layton's own relationship with her and consisted of memories of that relationship that Layton did not possess herself;

b. **Jesse** Ulery | **11-year-old cis female** who is more sexual in nature, cruel to others, and is highly manipulative;

c. **Anna** Ulery | **23-year-old cis female** who was religious, went through drug rehabilitation, and was present for most cult experiences;

d. **Mason** Ulery | **15-year-old cis male** with a violent personality who has received therapy for his violent tendencies and has learned to focus his tendencies towards protecting Layton and the others and to ensure their safety;

e. **Talia** Ulery | **14-year-old cis female lesbian;**

f. **Lee** Ulery | **13-year-old cis male** who is British, smart, introverted and enjoys crossword puzzles and brain teasers;

g. **AJ** Ulery | **6-year-old cis male** who, as one of the primary alters, presents more often than others, suffers from serious depression and emotional dysregulation, experiences bouts of emotional tantrums, and who occasionally presents against Layton's wishes; and

h. **Fragment Identities** | Also inhabiting Layton's mind are two fragmented identities without fully developed consciousness or identities. One of which is spiritual in nature but not religious; the other who imposes rules on Layton's roommate about not allowing certain things in their apartment, such as pornography and other offensive items.

14. In addition to DID, at the time of Defendant's assessment and treatment of Layton, she also suffered from Obsessive Compulsive Disorder (OCD), Attention Deficit Hyperactive Disorder (ADHD), Bipolar Disorder (BD), Major Depressive Disorder (MDD), anxiety, insomnia, body dysmorphia, and other psychological and physical comorbidities.

15. These disorders and the other comorbidities rendered Layton practically and legally disabled under Rhode Island law. Indeed, several of the Defendants noted as much in their

5

treatment of her and even assisted her in applying for and receiving disability assistance from the state. As noted in her records, these disabilities prevented Layton from being able to keep a job or otherwise manage her day-to-day affairs and left her perpetually on the brink of homelessness and in a constant stage of food insecurity.

16. Nevertheless, each Defendant chose to either ignore or minimize the significance of Layton's and her alters' disabilities and states of mind and/or their incapacity to fully consider and appreciate the life-long consequences of permanent medical transgender interventions (and thus their inability to give informed consent). Rather than resolve the various disorders and comorbidities impairing Layton's ability to function and/or exercise informed judgment as to her medical decision making, the Defendants prioritized their own preferences, personal ideologies, and professional agendas and placed Layton and her alters on a path towards full medical transition by pressuring her to adopt a transgender identity and prescribing her with cross-sex hormones that would only amplify her problems and cause irreversible and mentally and physically painful damages to her body.

### B. Layton seeks and receives treatment from the Defendants

#### i. Defendant Julie Lyons, LICSW

17. Layton's involvement with the Defendants begins with Defendant Julie Lyons, LICSW. Ms. Lyons, as a licensed therapist who considers herself transgender, experiences DID, and markets herself as specializing in treating patients with DID.

18. In or around summer of 2017, the people nearest to her recommended to her that she seek treatment for the DID symptoms she was then experiencing. Not knowing what to name the disorder, she googled her symptoms to find advertisements for Ms. Lyons and soon set her first appointment with her.

19. At this point in time, Layton did not consider herself to be transgender and was looking

6

for help for her DID, not her gender identity. Before meeting Ms. Lyons, Layton desired a womanly appearance, but due to undiagnosed body dysmorphia, Layton believed she was more likely to achieve a male appearance than a female one.

20. Yet rather than assist Layton in discovering and overcoming these harmful self-views as one would expect of a therapist, Ms. Lyons fixated on the fact that, like herself, Layton had alters with male genders and quickly jumped to the conclusion that Layton had gender dysphoria and began convincing Layton that she was a transgender man and in need of further medicalization.

21. Not only did Ms. Lyons deviate from a normal course of psychological treatment in her pressure for Layton to accept a transgender identity, but she also crossed numerous lines in the therapist–patient relationship. For example, in one instance, Ms. Lyons invited her boyfriend into a therapy session with Layton during which Ms. Lyons' and her boyfriend attempted experimental hypnosis techniques on Layton that caused her significant discomfort. In another example, when Layton was unable to pay Ms. Lyons' fee for continued visits, Ms. Lyons allowed Layton to continue her visits so long as she helped Ms. Lyons in recruiting new patients to her practice. And further trespassing across healthy therapist–patient boundaries, Ms. Lyons took Layton to an unconventional, new-age church service with her, which again left Layton feeling confused and uncomfortable. Layton, having only the cult to reference in terms of medical care, welcomed this odd relationship and was unable to realize its impropriety until several years later.

22. Moreover, in diagnosing Layton with gender dysphoria, Ms. Lyons failed to conduct any kind of psychosocial or other standard pre-diagnosis assessments of Layton's gender identity.Had she conducted a proper assessment, she would have discovered that Layton's desire to look like a man came from experiencing body dysmorphia and other mental health comorbidities, rather than gender dysphoria. But due to her failure to properly assess and diagnose Layton, Ms.

7

Case Number: PC-2023-05366
Filed in Providence/Bristol County Superior Court
Submitted: 11/12/2025 3:14 PM
Envelope: 5397721
Reviewer: Alexa G.

Lyons instead started Layton down a course of transgender medicalization that would ultimately cause her irreversible physical harm, and extreme mental anguish, which persists to this day. Notably, and ironically, Ms. Lyons diagnosed Layton with gender dysphoria despite Layton having alters who were cis gendered males and females, much like Ms. Lyons herself. In fact, not one of Layton's alters was transgender or gender dysphoric.

23. After diagnosing Layton with gender dysphoria, Ms. Lyons referred Layton to the care of Dr. Jason Rafferty of Thundermist Health Center, where Layton would suffer even more reckless transgender medicalization.

### ii. Thundermist Health Center and its practitioners, Dr. Jason Rafferty, Dr. Katherine Jarrell, Dr. Daniel Harris, Andrew Taylor, PMHNP, Arlene Flynn, FNP, Jessica Fidalgo, LMHC[5]

24. With a referral to Thundermist Health Center from Ms. Lyons for the purpose of furthering Layton's gender transition, Layton soon began visiting the various doctors and therapists employed and supervised by that clinic.

### July 26, 2017

25. Upon her first visit with Thundermist physician, Dr. Katherine Jarrell on July 26, 2017, Layton disclosed her prior diagnoses for gender dysphoria, DID, and other psychological comorbidities. Dr. Jarrell's notes also depict that Layton is then experiencing moderate depression. During this visit, still wanting to look more like a man, Layton expresses an interest in undergoing a double mastectomy but was not certain about taking testosterone out of concern for how that would affect or be received by her alters.

---

[5] All references to Thundermist practitioner notes, reports, and records come from treatment notes obtained by Plaintiff from Thundermist at Plaintiff's request. All such reports will be made available to all Defendant subject to Court approved protective order.

Case Number: PC-2023-05366
Filed in Providence/Bristol County Superior Court
Submitted: 11/12/2025 3:14 PM
Envelope: 5397721
Reviewer: Alexa G.

<u>November 3, 2017</u>

26. Shuffled to the Transition Health team, Layton then met with Family Nurse Practitioner, Arlene Flynn on November 3rd, 2017. During this visit, Nurse Flynn recorded Layton's prior diagnoses, that Layton had experienced feeling "down, depressed, or hopeless" and "several days" worth of "thoughts of hurting [herself] in some way or that [she] would be better off dead" and recorded an assessment of then suffering from "mild depression" and to "consider suicide assessment risk." Notably, Nurse Flynn also recorded a history of cocaine, alcohol, and Wellbutrin abuse in addition to a history of mental, sexual, and physical abuse. Nurse Flynn also noted that Layton was suffering from inadequate food supply, lack of utilities, no transportation.

27. On the topic of pursuing the transgender affirmative medicalization pushed on her by Ms. Lyons, Nurse Flynn recorded Layton's hesitations to following this course and noted that prior to treating for the purported gender dysphoria, Layton "wants to get mental health in order first" and that some of her alters were female, which presented a problem with starting hormone treatments. In fact, her notes reflect that after a discussion of the testosterone treatment, Layton refused the treatment saying she was not ready for that treatment.

<u>December 6, 2017</u>

28. Next, Layton visited with therapist, Jessica Fidalgo, LMHC, on December 6th, 2017, for a behavioral health diagnostic interview. This was the first visit where a Thundermist practitioner dug into the identities present in Layton's mind. In her notes, Fidalgo reported the presence of seven of Layton's alters and that each varied in their identities, but only noted one that identified as a male. Fidalgo also noted at that one alter, Jesse (the sexual maniac), was only 11 years old, and another was only 6 years old. Fidalgo noted that one alter, Liv, agreed to have a double mastectomy. Additionally, Fidalgo noted that Layton expressed at that time that she should have been psychiatrically hospitalized and that she was depressed most days with crying spells and

9

that she was experiencing derealization spells that lasted for hours or days at a time.

29. Importantly, Fidalgo noted that Layton experiences "dysphoria regarding to gender identity when in a state of *derealization*," and that these derealization spells would last for hours or days at a time.

30. Fidalgo also noted Layton's diagnosis of bipolar disorder with psychosis, mania, her tendency for impulsive behavior and racing thoughts, her spells of memory loss, nightmares, her previous traumatic experiences, her history of emotional and physical abuse, and a number of other psychological concerns.

31. Fidalgo also reported that one of Layton's alters was actively obstructing Layton's efforts to obtain transgender treatment by deleting voicemails or preventing Layton from becoming aware of appointments or other outreach by the medical providers.

32. As of this behavioral health diagnostic, Fidalgo concluded that Layton experienced depersonalizations, derealizations, paranoid ideations, cognitive distortions, ruminations, racing thoughts, indecisiveness, inadequacy, and paranoid ideations.

33. Fidalgo also assessed that Layton suffered from bipolar disorder with a then-currently severe depressive episode with psychotic features. Yet, despite these red-flags, Fidalgo failed to consider that life-altering transgender medicalization may not be appropriate for a patient in this state of mental and psychological crisis.

<u>December 12, 2017</u>

34. Less than a week later on December 12, 2017, Layton visited with Nurse Practitioner, Andrew Taylor, PMHNP, to conduct a diagnostic interview. This diagnostic interview revealed a host of issues complicated by Layton's psyche consisting of multiple personal identities that should have put an immediate end to Layton's transgender medicalization.

35. From that visit, Taylor concluded that Layton was suffering from depression and severe

10

anxiety, as did other practitioners. But Taylor also noted that Layton's symptoms were consistent with depression, anxiety, panic, PTSD, and that Layton would experience episodes where she was unable to differentiate between fiction and reality.

36. Demonstrating the need for treatment that encompasses and addresses *all* the identities occupying Layton's mind and their various comorbidities *before* choosing to pursue irreversible transgender medicalization on one of them, Taylor expressly acknowledged that Layton's symptoms were difficult to understand due to her alters also carrying varying diagnoses. For example, Taylor noted that borderline personality disorder symptoms were consistent with some of Layton's alters, but not with Layton herself.

37. Notwithstanding these glaring red-flag issues, Layton was also demonstrating alarming inconsistencies in her gender expression and intent to transition. Taylor noted that despite identifying as a trans man who was non-binary, Layton presented for her visit in "feminine attire with make-up, long hair" and whose gender expression was "incongruent" with her gender identification as a trans man. Further, Taylor reported that Layton expressed that "masculinization associated with testosterone does not feel right presently" and that there was disagreement amongst the identities about the transitioning treatments. In fact, there was so much disagreement that Layton reports times where one alter (Mason) would present and sabotage Layton's appointments by deleting calendar entries for appointments, ignoring or rejecting calls from her doctors, and otherwise acting to prevent Layton from making or attending appointments.

38. These identities were clearly distinct and independent from Layton and clearly had ideas, beliefs, relationships and impulses of their own. For example, Taylor's report noted that at this time, Layton's alter, Liv, was also in a relationship with Layton's girlfriend, Hannah and that Mason would also sometimes present, make impulsive decisions and subject Layton to self-harm

11

that she only discovered upon awaking from Mason's occupation of her mind.

39. Nowhere in Taylor's report does it state or even suggest that Layton's gender transition should be cancelled or even postponed due to these significant psychological hurdles. Also nowhere in Taylor's report does he suggest that further transgender medicalization should account for the needs of and impacts to the alters who sometimes present to live fully autonomous lives.

<u>January 9th, 2018</u>

40. A few weeks later, on January 9, 2018, Layton returned to Thundermist for a visit with Dr. Jason Rafferty for a behavioral health diagnostic interview in furtherance of the gender transition being orchestrated by Dr. Rafferty and his team.[6]

41. At this appointment, Dr. Rafferty acknowledged the red-flag details discovered in Layton's December 12th appointment with Nurse Taylor and noted additional details that should have served as even more warning to shift their focus from transitioning Layton's gender, which would impose life-altering irreversible consequences, to instead focus on healing her psychologically by readily available, non-invasive psychotherapy.

42. Dr. Rafferty also detailed the cult and the manipulation over Layton's mind it employed. Layton told Dr. Rafferty that she was "raped and molested by a lot of different people who were connected to the organization," and Dr. Rafferty concluded that it was due to how easily she trusts in others, how she suffered multiple sexual assaults (mistakenly attributing some of those

---

[6] Dr. Rafferty is the purported sole author of the 2018 Policy Statement from the American Academy of Pediatrics entitled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents," a misleading paper published in October 2018 that creates the misguided framework for the practice of rapidly "affirming" a child's gender identity, which is a practice that has now been proven to be built upon flawed or fraudulent studies.

assaults to have been by family members), and how she continued to suffer sexual assaults even after leaving the cult.

43. Dr. Rafferty noted that Layton's disorders were so disabling that they rendered her "unable to work or function due to constant switching between various identities," and that those switches result in memory loss for Layton.

44. Notably, Dr. Rafferty acknowledged that although Layton was interested in starting on testosterone, "not all of the alters agree[d]," and that consensus could be obtained among the alters during meetings of the alters facilitated by Ms. Lyons. The report noted that two of the alters, Liv and Jesse, were expressly against the testosterone treatments. Layton expressed to Dr. Rafferty that she did not take issue with her genitals and that she wanted testosterone "ASAP" so that she could begin looking like a man.

45. Dr. Rafferty noted that Layton "endorses a history of recurrent suicidal ideation (through alter Mason)," and stated that she "only felt suicidal twice in the last month, which is really good for me." The report noted three previous suicide attempts and the Layton's statement that, "I admit I have thoughts of overdosing on something," and "if I was not in a relationship, then I would be dead."

46. Dr. Rafferty summarized and concluded his thoughts on these red-flags as follows:

> Psychologically, [Layton] has had a childhood with extensive exposure to manipulation, emotional abuse, sexual trauma, invalidation and rejection. In the context of a cult, [Layton] likely had limited options for mental or physical escape likely underlying underdeveloped coping by dissociation. [The dissociation] could reflect psychosis, OCD, but most likely is a severe reaction to intense developmental trauma.
>
> . . .
>
> [Layton] is high risk based on mental state, poor social supports and engagement, chronic rejection, gender minority status, and chronic SI with vague plan. Socially, [Layton] has no connection to most of family due to cult. Primary support (financially and emotionally) is partner and roommate. Due to lack of income there [sic] significant concerns around housing, food security.
>
> . . .

13

Current goals are for masculinizing hormones (testosterone) and "top surgery" **but describes internal turmoil between alters about meaning of gender identity that likely requires additional support and exploration.** (emphasis added)

47. Despite having laid out *some* of the red-flags and correctly identifying that Layton was "high risk based on mental state," etc., and having reached the rational conclusion that the transgender medicalization treatment "likely requires additional support and exploration" because of these factors making her a "high risk," Dr. Rafferty inexplicably concluded with the following:

> **However, it is this provider's perspective that Testosterone would be indicated based on history, and with essential psychological supports in place.** (emphasis added)

48. This unexplained, egregious departure in rationale demonstrates just how far Dr. Rafferty was willing to go to ignore such high risks caused by her psychological conditions—risks that he identified —to keep Layton on the path of irreversible transgender medicalization.

49. Moreover, Dr. Rafferty paid no attention to the fact that, even if Layton was properly diagnosed and assessed as gender dysphoric in need of cross-sex hormones, which she certainly was not, to inject Layton with testosterone was to inject **Liv** (a cis gendered female who was against the treatment), **Jesse** (an 11-year-old cis gendered female), **Anna** (a religious 23-year-old cis gendered female), **Talia** (a 14-year-old cis gendered female), **AJ** (a 6-year-old cis gendered boy), and two other cis gendered teenage boys, Mason (15) and Lee (13).

50. Over the next couple weeks, Layton continued her regular follow up appointments with Nurse Taylor where she reported that she was no longer being treated by Ms. Lyons, that she was experiencing increased episodes of dissociation since seeing Dr. Rafferty, that she was experiencing increased suicidal ideation, and that she reported, "I feel like I'm not supposed to exist."

14

January 30th, 2018

51. Nevertheless, on January 30, 2018, Layton met again with Dr. Rafferty, who noted that she was no longer active in therapy, "and likely needs high level of psychiatric care [more] than [Thundermist Health Clinic] can provide." Notably, Dr. Rafferty's prior note approved testosterone only on the condition that Layton have "essential psychological supports in place" and that Layton would benefit from "assuring mental health supports in place first." Yet, as before, Dr. Rafferty ignores these additional red-flags and officially began Layton's testosterone regimen by instructing Nurse Taylor to provide the prescription.

52. Such ignorance of these risks and Layton's unsuitability for further transgender hormone medicalization and the total disregard Dr. Rafferty showed for the other identities affected by these treatments represents a substantial deviation from any recognizable standard of care that directly caused or contributed to Layton's life-long injuries.

February 2018 and Later

53. Over the following months, Layton continued to treat with various practitioners at Thundermist including therapist Jessica Fidalgo, LMHC, AJ Metthe, LCSW, and follow ups with Nurse Taylor, Nurse Flynn, and Dr. Rafferty. As is typical for prescribing testosterone to females, the testosterone gave Layton an initial boost in mood and affect, and she reported being pleased with the effects of the drug during her first few follow-ups.

**iii. Layton's Experience on testosterone quickly declines**

54. But that honeymoon phase with testosterone quickly wore off, and by August of 2018, Layton was expressing growing concerns about the testosterone and doubts about whether she should continue the treatments.

55. The concerns grew because Layton started experiencing significant, problematic side effects that were never disclosed to her. Unexpectedly, the testosterone was making her already

15

severe psychological disorders even worse. She began experiencing dangerous mood swings, fits of anger, more frequent bouts of depression, and feeling even more disconnected from herself and her sexuality than she was prior to the testosterone. The facial hair and other bodily responses to the testosterone were more severe than advertised, and she quickly realized that the treatment was not going as promised.

56. Layton expressed these concerns to Dr. Rafferty in follow up visits, but because Layton was expressing curiosity about discontinuing these treatments, that curiosity was met with cold, disinterested apathy from Dr. Rafferty and further insistence that a smaller dose of testosterone would help her to look like the man she wanted to be. Dr. Rafferty and the other Thundermist personnel never disclosed to Layton that gender-affirming treatments can in fact cause harm to individuals such as Layton. Thundermist clinicians hid from Layton the lack of evidentiary support for the idea that testosterone is a safe and effective mental health treatment and cures gender dysphoria. Instead of disclosing that information to Layton, Dr. Rafferty and the other Thundermist personnel hid those facts from her and insisted the testosterone was safe, effective, medically necessary, and would be beneficial to her and she should continue taking it no matter what. Then, once she informed Dr. Rafferty of her wish to discontinue the treatments, support from the Thundermist team dried up. For example, during the time Layton was active in pursuing transgender medicalization, Thundermist provided transportation for her to and from her appointments. But after she ended the transgender-affirming treatments with Rafferty, transportation to her other Thundermist appointments was now suddenly unavailable to her.

57. Yet despite the poor treatment, Layton still held to the belief planted and reinforced by the Defendants that she was trans and that maybe she just needed the testosterone in smaller doses for a longer period of time. She believed that for some reason, her body was not responding to the medication as it should have been. For that reason, and due to her

16

Case Number: PC-2023-05366
Filed in Providence/Bristol County Superior Court
Submitted: 11/12/2025 3:14 PM
Envelope: 5397721
Reviewer: Alexa G.

continued belief, reliance, and trust in Dr. Rafferty and his team that the transgender medicalization was in her best interest and would eventually result in the body image she wanted, Layton continued on testosterone, including through a doctor Lyons referred her to.

58. Enabled and encouraged by Defendants, and because she trusted and relied on their judgment to act in her best medical interest, Layton continued taking testosterone in small doses until the end of November 2021

## November 2021

59. After leaving Thundermist and moving to North Carolina, Layton sought treatment for her disorders from another therapy group called Monarch. Her practitioners there led her on a path of exploration helping her to think for herself about her issues and to uncover the underlying psychological roots for their manifestations. Over the course of just over a year of treatment with them (from March 2020 to May 2021), Layton learned the skills and tools she would need to ground herself in her present identity and would help bridge her various alters back into a unified identity she enjoys to this day. Over the fall months leading up to her November transformation, Layton employed the skills taught to her by the Monarch team to all but eliminate her depressive episodes and control her mindset to greatly reduce the number of DID episodes she experienced.

60. The final straw for Layton's complete transformation fell for her at the end of November 2021, when she discovered and began to employ Somatic Therapy in addition to the practices she learned from Monarch. With that practice added, Layton was finally able to completely merge the various alters into one, unified identity, which eliminated her identity splits. Moreover, with a new self-view, she was able to see that her desire for a male body was not gender dysphoria but body dysmorphia brought about by a late puberty, childhood bullying, trauma from sexual assaults, and an unhealthy perspective that she could never achieve the beauty of all the women

17

she encountered on social media and TV. With that realization, she stopped taking testosterone all together, no longer desiring to look like a man. Unfortunately for Layton, this transformation took place several years too late, and the damage from the years of testosterone was already done.

61. Importantly, the resolution of these numerous psychological impediments in November 2021 also cleared the mental disability that had for so long made Layton unable to manage her life. She was now able to hold down a job, more easily form healthy new relationships, and escape her disabled life being perpetually on the brink of homelessness and food insecurity.

62. Although her disability had lifted and she was now beginning to fully integrate into a normal, healthy life with her long-time partner, Layton's experiences with the Defendants were among the furthest things from her mind. It was not until January of 2023, after Layton had heard stories from other detransitioners about how they had been wrongfully guided down the transgender medicalization path, that she realized how each of the Defendants had so horribly failed to help her find that transformation before permanently damaging her body and life with the years of testosterone. Thundermist's and the other Defendants' suppression of material information, coupled with Layton's severe mental disabilities at the time, is why she was not able to discover she had been injured and that Thundermist and the other Defendants had caused her injury until she heard the stories of detransitioners who had learned of the harms of testosterone and could educate her about them. Prior to hearing from those detransitioners, Layton remained under the influence of Thundermist's and the other Defendants' representations to her that the testosterone was only beneficial and could not harm her.

63. Among other injuries and damages caused by this improper transgender medicalization at the hands of Defendants, Layton has suffered and will continue to suffer from among other things, body disfigurement, ongoing estrogen deficiencies, painful premenstrual dysphoric

18

disorder, suspected osteoporosis, development of painful skin nodules from testosterone injection sites, an onset of severe histamine sensitivity resulting in chronic severe allergies, suspected infertility, reduced sex drive, chronic hot flashes, genital pain and discomfort, chronic joint pain, and a host of emotional and/or psychological injuries including newly onset body dysmorphia, as to the changes testosterone brought about her body, significant emotional distress impacting many of her relationships, and many more. For each of these and more, Layton now seeks legal redress.

## COUNT I
## MEDICAL MALPRACTICE / GROSS NEGLIGENCE

64. Plaintiff repeats and incorporates by reference all of the allegations contained in the complaint.

65. Between 2017 and 2019, each of the Defendants provided Plaintiff with psychological and/or medical guidance related to the transgender-affirming care.  This treatment created a valid doctor/patient relationship between each Defendant and Plaintiff.

66. As Plaintiff's treating medical provider, each Defendant incurred a duty to apply the applicable standards of care in recommending and prescribing Plaintiff's treatments and therapies.  Alternatively, in the event of treatments not yet subject to a widely accepted standard of care, Defendants incurred a duty to act and exercise judgment in the Plaintiff's best medical interest and subjugate their own personal, professional, and commercial interests when exercising their professional judgment on Plaintiff's behalf.  Defendants' duties encompass the duty to exercise their judgment to bring about an outcome that involves the least amount of medical intervention possible.

67. Defendants each breached the duties owed to Plaintiff by, including but not limited to, the

19

following:

a. <u>Jason Rafferty, MD (Thundermist Health Clinic)</u>:  Dr. Rafferty breached his duty to Layton by, among other things, failing to consider and rule out less medically invasive treatments before persisting with a transgender-oriented therapy that involved cross-sex hormone therapies with irreversible consequences. Despite encountering clear red flags in Layton's condition, including her extensive trauma history and dissociative identity disorder, he continued with a transgender-affirming treatment plan without exploring less invasive alternatives. This breach of duty is evident in his failure to first identify and address the root causes of Layton's psychological issues, which later proved to be amenable to other therapies.

Moreover, Dr. Rafferty failed to account for the fact that any transgender medicalization treatment regimen should consider the needs and impacts on Layton's alters, who sometimes presented as fully autonomous individuals.  Dr. Rafferty administered or authorized treatments upon these individuals without first obtaining informed consent from the alters he was treating.

Dr. Rafferty's actions demonstrated a gross disregard for his duty to prioritize Layton's best medical interest and to explore treatments involving the least medical intervention possible, resulting in lasting harm to Layton and the injuries for which she now seeks redress.

20

b. <u>Julie Lyons, LICSW</u>:  Julie Lyons, as a licensed therapist and the initial point of contact for Layton, breached her duty to Layton by, among other things, deviating from standard psychological treatment protocols. While Layton sought help for her DID symptoms and had not yet identified as transgender, Ms. Lyons prematurely fixated on the assumption that Layton had gender dysphoria, without conducting proper psychosocial assessments of Layton's gender identity. This deviation from a normal course of psychological treatment led her to pressure Layton into accepting a transgender identity, initiating a path of reckless transgender medicalization. Furthermore, Ms. Lyons blurred the boundaries of the therapist-patient relationship by allowing Layton to participate in unconventional activities, involving her boyfriend in sessions, and even seeking Layton's assistance in recruiting new patients. Her actions demonstrated a disregard for her duty to prioritize Layton's well-being, leading to the harm Layton suffered as a result of the ensuing transgender-affirming treatments.

c. <u>Jessica Fidalgo, LMHC (Thundermist)</u>:  Therapist Jessica Fidalgo, LMHC, breached her duty to Layton by, among other things, failing to exercise necessary judgment and consider Layton's best medical interest. For example, During Layton's behavioral health diagnostic interview in December 2017, Fidalgo discovered the presence of seven of Layton's alters, each with unique identities, diagnoses, and comorbidities. Some of these alters even had dissenting opinions on the transgender treatments. Additionally, Layton expressed experiencing derealization spells lasting for hours or days, a form of severe dissociation. Fidalgo's notes documented a range of psychological issues, including bipolar disorder, depressive episodes with psychotic features, depersonalization,

21

derealization, and cognitive distortions.

Despite these significant psychological challenges and the lack of a consistent desire for gender transition, Fidalgo did not recommend canceling or even postponing Layton's gender transition. Moreover, she did not suggest that any further gender medicalization should account for the needs and impacts on Layton's alters, who sometimes presented as fully autonomous individuals. This lack of consideration and the failure to prioritize the least invasive medical interventions grossly deviated from the duty to act in Layton's best medical interest.

d. <u>Andrew Taylor, PMHNP (Thundermist)</u>: Andrew Taylor breached his duty of care to Layton through a series of critical failures in his assessment and treatment of her. Despite encountering numerous red flags during his diagnostic interview with Layton, including her complex presentation with multiple distinct identities, each carrying varying mental health diagnoses, Taylor proceeded with gender medicalization treatments without adequately addressing these issues.

Taylor's negligence is evident in his failure to conduct a thorough evaluation that would have considered the impact of gender medicalization on all of Layton's identities. While some of Layton's alters expressed a desire for transitioning, others, like Mason and Liv, actively opposed it and sabotaged Layton's appointments, deleting calendar entries and avoiding medical providers.

Furthermore, Taylor noted that Layton's gender expression was incongruent with her gender identification as a trans man and that masculinization associated with testosterone did not feel right for her at that time. Despite these inconsistencies, Taylor did not recommend postponing or reevaluating the gender

22

transition plan to ensure it aligned with Layton's psychological and emotional needs.

Taylor's failure to recognize the unique challenges posed by Layton's dissociative identity disorder (DID), acknowledge the differing perspectives of her alters, or obtain informed consent from these alters before proceeding with irreversible medical treatments constitutes a gross breach of his duty of care to Layton. This gross negligence contributed to the harm Layton experienced as a result of inappropriate and insufficiently considered transgender medicalization.

68. Each of these breaches by the various Defendants caused and or contributed to or aggravated the injuries for which Layton now seeks redress.

WHEREFORE, Plaintiff demands judgment against Defendants including compensatory and punitive damages. Plaintiff also request attorney's fees and costs, and such other relief as this Court deems meet and just.

## COUNT II
## NEGLIGENCE AGAINST THUNDERMIST HEALTH CLINIC

69. Plaintiff repeats and incorporates by reference all of the allegations contained in the complaint.

70. Between 2017 and 2019, Defendant Thundermist Health Clinic and its agents or employees provided Layton with medical care. As such, Layton was a patient of Thundermist and Thundermist owed Layton a duty to exercise reasonable care in hiring or extending privileges to the doctors it employed or allowed to provide services from its facility. A health care facility breaches this duty when it hires or extends privileges to a doctor who exposes the patient to an unreasonable risk of harm.

23

71. During the time of Layton's treatments at Thundermist under the care of Dr. Rafferty and other Defendants, Dr. Rafferty had begun developing and employing a novel and untested rapid affirmation model that intentionally bypasses the generally accepted standard of care, which includes the standard practice of exploring the root-causes of a patient's gender dysphoria and proposing and ruling out alternative, less invasive therapies. Thundermist was or should have been aware of such practices, as Dr. Rafferty was widely known for employing such experimental treatments.

72. Because Layton did not then need immediate, emergency intervention from the Rafferty team, the time it would take to explore and rule out such less invasive alternatives would have presented few if any negative consequences. By employing this model to bypass the exploration of the root-causes of Layton's discomfort with her body and rapidly affirming and accelerating a transgender transition with the use of permanent, life-altering drugs like testosterone, Thundermist practitioners exposed Layton to risks of an unreasonable risk of unwanted life-long injuries, and ultimately did cause such injuries.

WHEREFORE, Plaintiff demands judgment against Defendant including compensatory and punitive damages. Plaintiff also request attorney's fees and costs, and such other relief as this Court deems meet and just.

## COUNT III
## LACK OF INFORMED CONSENT

73. Plaintiff repeats and incorporates by reference all of the allegations contained in the complaint.

74. Separate and distinct from their duties owed to Layton under the general standard of care, each of the doctors treating Layton owed a duty to fully address both the material risks associated with the invasive transgender-affirming treatments and all viable alternatives to such

24

procedures.

75. Defendants Dr. Rafferty and Andrew Taylor each breached this duty to provide and obtain informed consent in several ways: first, certain material risks and consequences of the testosterone therapy were not discussed with Layton before administration of the transgender-affirming testosterone treatments; second, certain alternatives, such as the psychotherapeutic treatment alternative that ultimately resolved Layton's underlying issues were not offered or discussed with Layton before administration of the transgender-affirming testosterone treatments; and third, no attempt whatsoever was made to obtain informed consent for the transgender-affirming testosterone treatments from any of Layton's alters, of which some of them were actually opposed to such treatments and which such treatments would aggravate existing psychological issues.

76. Because the Defendants failed to provide the necessary informed consent and discuss the viable, non-invasive alternatives to the transgender-affirming testosterone treatments, Layton was unable to consider or attempt such treatments before undergoing years of irreversible testosterone changes to her body, which ultimately failed to address her underlying issues.

WHEREFORE, Plaintiff demands judgment against Defendant including compensatory and punitive damages. Plaintiff also request attorney's fees and costs, and such other relief as this Court deems meet and just.

## COUNT IV
## VICARIOUS LIABILITY AGAINST THUNDERMIST HEALTH CLINIC

77. Plaintiff repeats and incorporates by reference all of the allegations contained in the Complaint.

78. At all times relevant, Defendants Rafferty, Fidalgo, and Taylor were agents, principals, employees, or borrowed servants of Defendant Thundermist Health Clinic. Thundermist Health

25

Clinic exercised control and/or supervision over Defendants Rafferty, Fidalgo, and Taylor and their ability to practice under the Thundermist Health Clinic name and within its facilities. While in the course and scope of their duties or employment with Thundermist Health Clinic, Defendants Rafferty, Fidalgo, and Taylor committed numerous acts of negligence and gross negligence that caused injury to Layton.  Therefore, Thundermist is vicariously liable for the injuries caused by Defendants Rafferty's, Fidalgo's, and Taylor's negligence and gross negligence under the doctrine of respondeat superior.

WHEREFORE, Plaintiff demands judgment against Defendants including compensatory and punitive damages.  Plaintiff also request attorney's fees and costs, and such other relief as this Court deems meet and just.

Plaintiff,
By her Attorneys,

*/s/Gregory P. Piccirilli, Esquire #4582*
2 Starline Way, #7
Cranston, RI  02921
Telephone No.: (401) 578-3340
gregory@splawri.com

**CAMPBELL MILLER PAYNE, PLLC**
5955 Alpha Rd #1491
Dallas, Texas 75240
Telephone: (214) 316-7156
   Ronald L. Miller (*Pro Hac Vice)* Texas State
   Bar No. 24095424 ron@cmppllc.com
   Daniel Sepulveda (*Pro Hac Vice)* Texas State
   Bar No. 24100910 daniel@cmppllc.com

26